

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

FILED IN OPEN COURT
U.S.D.C. - Atlanta

NOV - 6 2019

By: _____ JAMES N. HATTEN, Clerk
Deputy Clerk

UNITED STATES OF AMERICA

*v.*

JALAL HAJAVI, ~~█████~~
█████ █████

**REDACTED**

Criminal Indictment No.

**1:19-CR-443**

~~Under Seal~~

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 21 2019

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

THE GRAND JURY CHARGES THAT:

<u>Count One</u>

*Conspiracy to Violate the International Emergency Economic Powers Act*
(50 U.S.C. § 1705)

<u>Introduction</u>

At all times material to this Indictment:

1.     Defendant JALAL HAJAVI ("HAJAVI") was an Iranian citizen and a

United States permanent resident alien who resided in Florida and then

Pennsylvania.  HAJAVI was the president, chief executive officer and sole

employee of JSH HEAVY EQUIPMENT, LLC ("JSH").

2.     Defendant ███ ██████ ("█████████ was a citizen

and resident of Iran, and worked for Aypa Company ("AYPA"), an Iranian

company based in Iran.

3.      JSH was a Florida corporation owned and operated by defendant HAJAVI. JSH was in the business of acquiring heavy construction machinery, ("Heavy Equipment") in the United States for export to the Middle East, including Iran.

4.      AYPA was a corporation organized under the laws of Iran and headquartered in Tehran, Iran.   AYPA was in the business of purchasing heavy construction machinery and other industrial equipment from the United States and arranging for delivery to customers in the Middle East, including Iran.

5.      A.N.B.S.A.C. was a freight forwarding company located in Tehran, Iran.

6.      Person 1 was a person in Iran associated with A.E., a company located in Tehran, Iran, that was in the business of purchasing heavy construction and industrial equipment, including the Heavy Equipment.

**The International Emergency Economic Powers Act (IEEPA)**

7.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic restrictions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or

economy of the United States when the President declared a national emergency with respect to that threat.

8.      On March 15, 1995, the President issued Executive Order 12957, which declared that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency under IEEPA to deal with that threat.  Executive Order 12957 was expanded by Executive Order No. 12959 (issued on May 6, 1995) and Executive Order 13059 (issued on August 19, 1997), and most recently extended on March 12, 2018.  *See* 83 Fed. Reg. 11393 (Mar. 14, 2018).  Executive Orders Nos. 12959 and 13059 (collectively, "the Executive Orders") prohibit the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.   The Executive Orders were in effect at all times relevant to this Indictment.

9.      The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations

3

("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.  On October 22, 2012, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") renamed the "Iranian Transactions Regulations" the "Iranian Transactions and Sanctions Regulations" and reissued them in their entirety so that all the terms and provisions remained the same (the "ITSR").

10.    The ITSR generally prohibited, among other things, (i) the export, reexport, sale, or supply, directly or indirectly, of any goods, technology, and services from the United States to Iran; and (ii) the engagement by a U.S. person in any transaction or dealing in or related to goods, technology, and services for export, reexport, sale, or supply, directly or indirectly, to Iran, without prior authorization or license from OFAC.  These regulations further prohibited any transactions that evade or avoid, or have the purpose of evading or avoiding, any of the prohibitions contained in the ITSR, including the unauthorized export of goods from the United States to a third country if the goods are intended or destined for Iran.

11.    The ITSR prohibits a person within the United States, or a U.S. person, from performing services for Iran or a person in Iran, including a brokering function.  "Brokering function" includes a U.S. person acting as a

4

broker for the provision of goods, services or technology, from whatever source,

to or from Iran or a person in Iran. *See* Title 31, Code of Federal Regulations,

Sections 560.204, 560.416.

12.   At no time did defendant HAJAVI, defendant ████████ JSH,

or AYPA, or any exporter involved in the transactions discussed herein, apply

for, receive, or possess a license or authorization from the Office of Foreign

Assets Control to export or provide any Heavy Equipment or other items, goods,

technology or services, of any description to Iran or any person in Iran; or to

engage in any transaction or dealing in or related to Heavy Equipment or other

items and goods for export, reexport, sale, or supply, directly or indirectly, to

Iran.

### The Export Administration Regulations

13.   The United States Department of Commerce was responsible for

reviewing and controlling the export of certain goods and technologies from the

United States to foreign countries.  The Export Administration Act ("EAA"), 50

U.S.C. §§ 4601-4623, authorized the U.S. Department of Commerce to prohibit or

curtail the export of any goods and technology as necessary, to protect, among

other things, the national security and foreign policy of the United States.  The

U.S. Department of Commerce, through its arm, the Bureau of Industry and

Security ("BIS"), implemented that authority through the Export Administration

Regulations ("EAR"), 15 C.F.R. Parts 730-774. Although the EAA had lapsed, the EAR continued to be in effect under the provisions of IEEPA by virtue of Executive Order 13222 (August 17, 2001), as extended by successive Presidential notices, the most recent being on August 8, 2018.  *See, e.g.*, 83 Fed. Reg. 39,871 (Aug. 13, 2018).

14.    Through the EAR, BIS reviewed and controlled the export from the United States to foreign countries of certain U.S. items.  15 C.F.R. §§ 734.2-.3.  In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.

15.    The most sensitive items subject to EAR controls were identified on the Commerce Control List, or "CCL," set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1.  Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which had associated export control requirements other than destination, end use, and end user-based license requirements.

6

**The Conspiracy**

16.      Beginning in or about September 2012, the exact date being unknown to the Grand Jury, and continuing through in or about at least January 2016, in the Northern District of Georgia and elsewhere, defendants JALAL HAJAVI and ███  ████████ did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to knowingly and willfully export and reexport Heavy Equipment from the United States to Iran; and to engage in a transaction or dealing with regard to the export and reexport of Heavy Equipment from the United States to Iran, without first having obtained from the U.S. Department of the Treasury's Office of Foreign Assets Control a license for such export, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Sections 560.203, 560.204, 560.205, and 560.206.

<u>Objects</u>

17.      The objects of the conspiracy were:

a.      To broker, acquire and procure Heavy Equipment for and on behalf of defendant ███  ████████ in Iran and ████████ s customers in the

Middle East, including Iran, in violation of the regulations and prohibitions of IEEPA and the ITSR.

b.      To conceal from the U.S. government and defendant JALAL HAJAVI's suppliers of Heavy Equipment in the United States that the Heavy Equipment was to be exported and transshipped to Iran for defendant ██████ ███████████ and ███████████ s customers in Iran.

c.      To make financial profit for defendants and other coconspirators through evasion of the regulations and prohibitions of IEEPA and the ITSR.

<u>Manner and Means</u>

18.      Defendants JALAL HAJAVI and ████ ██████████ together with others known and unknown to the Grand Jury, would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a.      Defendant HAJAVI and JSH provided services from the United States for defendant ███████████ located in Iran, including brokering the purchase of Heavy Equipment in the United States for customers of defendant ███████████ in Iran and other countries.

b.      Defendant ███████████ gave directions to and placed orders with defendant HAJAVI and JSH to procure Heavy Equipment located in the United

8

States on behalf of defendant ▮▮▮▮▮▮▮▮s customers in other countries, including in Iran; arranged for delivery of the Heavy Equipment to Iran and elsewhere; and caused the reexport of U.S.-sourced Heavy Equipment to Iran from companies located in the United Arab Emirates (the UAE).

      c.     Defendant ▮▮▮▮▮▮▮▮ would notify defendant HAJAVI about the specifications, such as the make and model, for items of Heavy Equipment sought by the Iran-based customers of defendant ▮▮▮▮▮▮▮▮

      d.     Defendant HAJAVI and JSH would conduct searches in the United States to locate and procure the Heavy Equipment requested by defendant ▮▮▮▮▮▮▮▮ often using online auction sites and other resources for the purchase of new and used heavy construction equipment in the United States.

      e.     Defendant HAJAVI and JSH would communicate to defendant ▮▮▮▮▮▮▮▮ the results of such research for the requested items of Heavy Equipment, which items defendant ▮▮▮▮▮▮▮▮ was seeking to acquire for and broker to his Iranian customers.

      f.     Defendant ▮▮▮▮▮▮▮▮ would communicate to defendant HAJAVI the confirmation by Iranian customers in Iran of their interest in procuring one or more items of Heavy Equipment.

9

g.    Using email, telephone calls and messaging applications, defendants ████████ and HAJAVI would negotiate the terms of the order, including (i) the final purchase price; (ii) the route and cost of export from the United States to the UAE; and (iii) the route and cost of the reexport from the UAE to Iran.

h.    Defendant HAJAVI, through JSH, would negotiate the purchase price of items of Heavy Equipment with their various sellers in the United States, and engage freight forwarders in Marietta, Georgia, in the Northern District of Georgia, and elsewhere in the United States, to cause the delivery of the items of Heavy Equipment to the UAE.

i.    Defendant HAJAVI would provide materially false information to the freight forwarders about the ultimate destination and end users of the items of Heavy Equipment that were to be shipped to the UAE.  Defendant HAJAVI did so knowing that the UAE companies identified to the freight forwarders were acting as "straw purchasers," or serving only as intermediaries, and were, in fact, engaged in reexporting the items to Iran for the benefit of defendant ████████

j.    Defendant ████████ would pay for the U.S.-origin Heavy Equipment orders through international monetary wire transfers.  Defendant HAJAVI would gain as a profit the difference between the resale purchase price

10

paid by defendant ███████ for the Heavy Equipment and the original

purchase price charged by the U.S.-based sellers.

k.    Defendant ███████ would make arrangements to deliver the

Heavy Equipment to the ultimate end-user clients in Iran upon delivery of the

Heavy Equipment to the UAE and after clearance through Iranian customs.

## Overt Acts

19.    In furtherance of this conspiracy, and to accomplish its purpose and

object, at least one of the conspirators committed or caused to be committed, in

the Northern District of Georgia and elsewhere, at least one of the following

overt acts, among others:

## Earthmovers

20.    On or about November 29, 2012, defendant ███████ emailed

defendant HAJAVI, subject "Statements 09/28/12," and stated that he was

"[p]roviding you [HAJAVI] the Dubai and domestic expenses tentatively."  This

email contained a detailed list of expenses associated with the purchase by

defendant HAJAVI of certain U.S.-origin earthmover equipment (the

"Earthmovers"), a type of Heavy Equipment, and the costs of reexport through

Dubai, UAE, to Iran.  This email included a list of costs, valued in UAE currency,

of customs clearance, delivery and other fees during transshipment through the

UAE, and the costs, valued in Iranian currency, of final delivery in Iran,

including customs clearance, unloading, transit from the Port of Chabahr, Iran to

the Port of Bandar Bushehr, Iran, and other miscellaneous fees, transportation

expenses and repair costs for the purchase of the Earthmovers brokered by

defendant HAJAVI on behalf of defendant █████████ for delivery to end-

user customers in Iran.

### Blasthole Drill

21.     On or about November 23, 2015, defendant HAJAVI emailed

defendant █████████ ten photographs of a U.S.-origin Crawler Mounted

Rotary Blasthole drill (the "Blasthole Drill").

22.     On or about December 8, 2015, defendant HAJAVI emailed an

invoice for the Blasthole Drill to F.P., a freight forwarding company located in the

Northern District of Georgia, and made arrangements for F.P. to ship the

Blasthole Drill from Brunswick, Georgia to Jebel Ali, UAE.

23.     On or about December 10, 2015, defendant HAJAVI caused F.P. to

list R.D.G.T., a company in the UAE, with a listed address in the UAE, as the

"Ultimate Consignee" of the Blasthole Drill, when as defendant HAJAVI then

and there knew, the true purchaser and end user was located in Iran.

24.     On or about December 21, 2015, defendant █████████ sent, or

caused to be sent, a wire transfer of $77,035 to defendant HAJAVI and JSH to a

12

BMO Harris Bank account (the "BMO Account") in the United States in partial payment for the Blasthole Drill.

25.     On or about December 28, 2015, defendant ████████ sent, or caused to be sent, a wire transfer of $8,975 to defendant HAJAVI and JSH at the BMO Account for partial payment of the Blasthole Drill.

26.     On or about January 1, 2016, defendant HAJAVI and JSH caused the Blasthole Drill to be exported from the Port of Brunswick, Georgia, with export documentation listing the shipment as "boring machinery," valued at $73,500.

27.     On or about January 3, 2016, Person 1 requested that defendant ████████ provide further information for the reshipment of the Blasthole Drill from the UAE to Iran, including information about the commodity, packing, quantity, place of lading, place of departure, gross weight, dimensions, and freight.  The signature line for Person 1's email represents that she is an employee of the marketing department of A.N.B.S.A.C. in Iran.

28.     On January 3, 2016, ████████ replied to Person 1 by sending an email with an attachment of two photographs of the Blasthole Drill and with instructions to ship the Blasthole Drill from the Port of Jebel Ali in

Dubai, UAE to the Port of Bandar Abbas, Iran, and to thereafter transport the

Blasthole Drill to Tehran, Iran.

All in violation of Title 50, United States Code, Section 1705.

## Count Two

*Smuggling Goods from the United States*
(18 U.S.C. § 554)

29.     The allegations contained in Paragraphs 1 through 28 of this

Indictment are incorporated and realleged by reference herein.

30.     On or about January 1, 2016, in the Northern District of Georgia and

elsewhere, defendants JALAL HAJAVI and ███████████ aided and

abetted by others known and unknown, did fraudulently and knowingly attempt

to export and send from the United States certain merchandise, objects and

articles, and did fraudulently and knowingly buy and facilitate the transportation

and sale of such merchandise, objects and articles, namely a Crawler Mounted

Rotary Blasthole Drill, knowing the same to be intended for exportation contrary

to the laws and regulations of the United States, to wit, Title 50, United States

Code, Section 1705(a), Executive Orders 12957, 12959, and 13059; Title 31, Code of

Federal Regulations, Sections 560.203, 560.204 and 560.206; and Title 13, United

States Code, Section 305.

All in violation of Title 18, United States Code, Section 554 and Section 2.

14

## Count Three

*International Emergency Economic Powers Act*
(50 U.S.C. § 1705)

31.     The allegations contained in Paragraphs 1 through 28 of this

Indictment are incorporated and realleged by reference herein.

32.     On or about January 1, 2016, in the Northern District of Georgia and

elsewhere, defendants JALAL HAJAVI and ███ ████████████ aided and

abetted by others known and unknown, did knowingly and willfully export,

attempt to export, and cause the export of, a Crawler Mounted Rotary Blasthole

Drill from the United States to Iran without having first obtained the required

authorization from the United States Department of Treasury.

All in violation of Title 50, United States Code, Section 1705, and Title 31,

Code of Federal Regulations, Sections 560.203 and 560.204, and Title 18, United

States Code, Section 2.

## Count Four

*International Emergency Economic Powers Act*
(50 U.S.C. § 1705)

33.     The allegations contained in Paragraphs 1 through 28 of this

Indictment are incorporated and realleged by reference herein.

15

34.     On or about December 8, 2015, in the Northern District of Georgia and elsewhere, defendant JALAL HAJAVI, aided and abetted by others known and unknown, did knowingly and willfully attempt to violate, and cause to be violated, the United States trade regulations with Iran by attempting to engage in, and engaging in, a transaction and dealing in or related to goods, technology, and services for sale and supply, directly or indirectly, to Iran, without first having applied for or obtained by such application the necessary license and authorization from OFAC, in that defendant HAJAVI brokered, negotiated, and facilitated the sale of a Crawler Mounted Rotary Blasthole Drill, from the United States to Iran without having first obtained the required authorization from OFAC, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.206, and Title 18, United States Code, Section 2.

## Forfeiture Provision

35.     As a result of committing one or more of the offenses alleged in Counts One through Four of this Indictment, defendants JALAL HAJAVI and ██████ ███████████ shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section

16

982(a)(2); and Title 28, United States Code, Section 2461, all property, real and personal, constituting or derived from proceeds traceable to the offenses.

36.      If, as a result of any act or omission of a defendant, any property subject to forfeiture:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third person;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 18, United States Code, Section 982(b)(1); Title 21, United States Code, Section 853(p); and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property of said defendant

up to the value of the forfeitable property.


A_____*TRUE*_____BILL


_Letitia Benjamin_
FOREPERSON


BYUNG J. PAK
   *United States Attorney*

BRIAN M. PEARCE
   *Assistant United States Attorney*
Georgia Bar No. 568768

600 U.S. Courthouse
75 Ted Turner Dr., S.W.
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

WILLIAM MACKIE
   *Trial Attorney*
N.C. Bar 13816

U.S. Department of Justice
National Security Division
950 Pennsylvania Ave. N.W.
Washington DC. 20530
202-233-0986; Fax 202-532-4251